3:21-cv-00498-KAD Dimartino et al
v
Easter et al

MAY 19 2021 PM 12:18
FILED_M- USDC - BPT- CT

Exibit

Federal Public & community Defenders

May 4, 2021

to
committee on the Judiciary

9 Pages

Michael milehn
76060-066
5/13/21

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
Co-Chairs
David Patton
Executive Director
Federal Defenders of New York
Jon Sands
Federal Defender
District of Arizona
1
May 4, 2021
The Honorable Dick Durbin
Chair
Committee on the Judiciary
United States Senate
Washington, DC 20150
The Honorable Chuck Grassley
Ranking Member
Committee on the Judiciary
United States Senate
Washington, DC 20150
Dear Chairman Durbin and Ranking Member Grassley:
Thank you for holding the April 15, 2021, "Oversight of the Federal Bureau of Prisons" hearing ("Hearing") in the Senate Judiciary Committee.1 During the Hearing, the Committee appropriately focused its oversight on the Bureau of Prison's (BOP) response to COVID-19 and its implementation of the bipartisan First Step Act (FSA). We offer comments on these topics below.
At any given time, Federal Public and Community Defenders, along with other appointed counsel under the Criminal Justice Act, represent 80 to 90 percent of individuals charged with federal crimes because they cannot afford counsel. Most of our convicted clients serve terms of months and years in BOP.
We thank the committee for prioritizing BOP oversight at a time when, as Chairman Richard Durbin recognized at the Hearing, "our prison system is failing . . .. to fulfill its fundamental purpose: the rehabilitation of incarcerated individuals."2 Over the past year, during the COVID-19 crisis, this failure has been compounded by BOP's abdication of its basic duty to protect the health and safety of individuals in its care and custody. These twin crises the failed COVID-19 response and the fundamental failure to rehabilitate are occurring in a system that is overwhelmingly and disproportionately populated by Black, Hispanic, and Indigenous individuals.
3
Although the Biden Administration has taken significant steps to beat back COVID-19 in the community, individuals in BOP custody remain at high risk. Over a year into the pandemic, they are

1 Oversight of the Federal Bureau of Prisons Before the S. Comm. on the Judiciary 117th Cong. (Apr. 15, 2021) ("Hearing"), https://www.c-span.org/video/?510804-1/senate-judiciary-committee-hearing-federal-prison-system.
2 S. Comm. on the Judiciary, Durbin Delivers Opening Remarks During Federal Bureau of Prisons Oversight Hearing, (Apr. 15, 2021), https://www.judiciary.senate.gov/press/dem/releases/durbin-delivers-opening-remarks-during-federal-bureauof-prisons-oversight-hearing.
3 Bureau of Prisons, Inmate Race (last updated Apr. 17, 2021), https://www.bop.gov/about/statistics/statistics_inmate_race.jsp.

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

----------------------------------------------------------------------------------------

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
2
subject to harsh and restrictive conditions of confinement and lack adequate access to medical care,
mental health services, and programming. The improvements to programming promised by the First
Step Act (FSA) generally stand unfulfilled: As Senator Chuck Grassley concluded at the Hearing, the
Department of Justice (DOJ) and BOP's lackluster implementation of the Act makes it appear that
DOJ and BOP "want it to fail."4
For too long, DOJ and BOP have ignored congressional directives to prioritize the safety and
rehabilitation of individuals in its custody, and left tools provided by Congress unused. These
failures have been exacerbated by a culture that bends towards opacity and against accountability.
We urge Congress to intervene. At minimum, it must strengthen and increase its oversight of DOJ
and BOP to help ensure that federally incarcerated persons remain safe and that Congress' vision for
sentencing and prison reform is realized. At best, it will enact legislation to smartly and swiftly lower
prison populations and to move vulnerable individuals to a place of relative safety.
I. The COVID-19 Crisis in the Bureau of Prisons
For the past 13 months, COVID-19 has torn through BOP facilities. Meanwhile, BOP has failed to
take the necessary steps or to use available resources to remediate the pandemic's risk. Even
now, despite the increased availability of vaccines across the country, COVID-19 remains a lifethreatening risk to those in BOP
custody. The death count of incarcerated individuals continues to
mount, and conditions in federal detention facilities remain dire.
Preventable deaths in BOP continue. At least 244 individuals in BOP care, including private
prisons, have died from COVID-19, with deaths continuing in recent weeks. Since March 1, 2021, at
least nine individuals have died while in BOP custody due to COVID-19.
5 One study calculated that
within BOP, the COVID-19 case rates and the standard mortality ratio were approximately 5 and
2.5 times higher than those for the U.S. adult population, respectively.6
Preexisting and long-standing deficiencies in BOP's health care services have contributed to the
spread and lethality of COVID-19. Dr. Homer Venters, a physician and epidemiologist who has
inspected several BOP facilities to assess their COVID-19 response, identified a "disturbing lack of
access to care when a new medical problem is encountered" and is concerned that "[w]ithout a
fundamental shift in how BOP approaches . . . health services, people in BOP custody will continue
to suffer from preventable illness and death, including the inevitable and subsequent infectious
 4 Hearing at 29:30.
5 Bureau of Prisons, COVID-19 (last accessed Apr. 26, 2021) (BOP COVID-19 site),
https://www.bop.gov/coronavirus/.. It appears BOP removed 7 people from the death tally from private prisons. Univ.
of Iowa College of Law Fed. Crim. Def. Clinic, 245 Deaths in BOP Custody, an Incalculable Loss (Mar. 25, 2021),
https://law.uiowa.edu/sites/law.uiowa.edu/files/2021-03/They Are Human Too 3-25-21.pdf.
6 Robin Toblin et. al., COVID-19 Case and Mortality Rates in the Federal Bureau of Prisons, Am. J. of Prevent. Med. (Feb. 24,
2021), https://www.ajpmonline.org/article/S0749-3797(21)00119-7/fulltext; see also Hearing (Joint Statement of Aaron
Littman, Lauren Brinkley-Rubenstein, and Michelle Deitch),
https://drive.google.com/file/d/1FxIlc4qq73pDDx1PgZLA1OaHkz2mjp4w/view (In January 2021, "the active
infection rate in federal prisons was more than five times that of the country's overall population."

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
3
disease outbreaks."7 Examples of BOP's failure to deliver adequate care abound. For instance, Curtis Horne, 59, and Jessie Carter, 54, both suffered from long-term medical conditions; both were found unresponsive, and later pronounced dead. Only after their deaths did they test positive for COVID19.8 And the deaths of at least 16 other incarcerated people, who BOP classified as "recovered"
from COVID-19 prior to their deaths, raise serious questions about the ability of BOP to care for COVID-positive individuals in custody.
9
Vaccines have not abated the crisis. During the Hearing, BOP Director Michael Carvajal testified that only 51% of BOP staff had accepted vaccination and that about 40% of the in-custody population in BOP custody had received the vaccine as of April 15, 2021.
10 The high refusal rate by
BOP staff is particularly alarming because, as BOP has acknowledged, staff "present a higher potential vector for transmission."11 Experts are also now warning that reaching "herd immunity" is unlikely in the United States.
12 Particularly worrying is the possibility that reduced vaccine efficacy
against new variants might lead to even more resistant variants in the future.
13
Public health experts agree that, with or without vaccines, the main strategies available to prevent the spread of the virus are social distancing, testing and isolation of cases, and use of appropriate personal protective equipment (PPE).
14 BOP has failed to adequately provide these interventions.

7 Hearing (Statement of Dr. Homer Venters) ("Dr. Venters Statement") at 2, https://assets.documentcloud.org/documents/20616259/ventersbop.pdf.
8 Bureau of Prisons, Inmate Death at USP Florence (Mar. 24, 2021), https://www.bop.gov/resources/news/pdfs/20210324_press_release_flx.pdf; Bureau of Prisons; Inmate Death at FCI Talladega (Mar. 18, 2021), https://www.bop.gov/resources/news/pdfs/20210318_press_release_tal.pdf.
9 Bureau of Prisons, Press Releases, https://www.bop.gov/resources/press_releases.jsp (last accessed April 29, 2021) (press releases for deaths of Adrian Solarzano, FCI Terminal Island; Christopher Carey, FCI Lompoc; Harry Edward Cunningham, FCI Memphis; Jimmy Allen Monk, FCI Talladega; Kevin Gayles, FCI Jesup; Girard Lafortune, FMC Devens; Spencer Sarver, USP Atlanta; Joseph Lee Fultz, FCI Terre Haute; Shauntae Hill, FCI Terre Haute; Johnathan Delargy, FCI Seagoville; Fernando Marulanda Trujillo, FCI Fort Dix; Jaime Benavides, MCFP Springfield; Leonard Williams, MCFP Springfield; Chad Noziska, FCI Sheridan; William Andrew Davison, USP Tucson; Paul F.. Archambault, Sr, FMC Devens).
10 Hearing at 46:13-46:42; 47:21-47:56.
11 Clare Hymes, Federal Prisons to Prioritize Staffers for COVID-19 Vaccine and Give to Inmates when More Doses are Available,
CBS News (Dec. 16, 2020), https://www.cbsnews.com/news/covid-vaccine-federal-prisons-staffers/.
12 See Apoorva Mandavilli, Reaching 'Herd Immunity' Is Unlikely in the U.S., Experts Now Believe, NY Times (May 3, 2021), https://www.nytimes.com/2021/05/03/health/covid-herd-immunity-vaccine.html; Christie Aschwanden, Five Reasons why COVID Herd Immunity is Probably Impossible, Nature (Mar. 18, 2021), https://www.nature.com/articles/d41586-021-00728-2.
13 Rogier Sanders et. al., Pandemic Moves and Countermoves: Vaccines and Viral Variants, The Lancet (Mar. 30, 2021), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00730-3/fulltext.
14 Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (updated Feb. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
4
Quarantine space has been insufficient,
15 and for incarcerated individuals who test positive, many
receive virtually no care, are "ignored" by BOP staff, and are mixed with healthy individuals "in
haphazard quarantines."16 PPE use has been inconsistent, inmate and staff movement has been
insufficiently limited, and screening has been inadequate.17 Testing protocols have also been
inconsistent and insufficient. From February to August 2020, BOP had administered at least one
COVID-19 test to only roughly 31% of the population,
18 and BOP takes the position that it cannot
require staff to take COVID-19 tests.
19 The Office of the Inspector General (OIG) noted that
problems were created by BOP's transfer of individuals between facilities and the U.S. Marshals
Service's "practice of transporting prisoners without first testing to confirm that they were COVID19 free."20
BOP and DOJ have failed to use the tools Congress gave them to safely lower prison
populations. The failure by DOJ and BOP to use tools to move vulnerable individuals to a place of
relative safety either by transferring them to home confinement or by seeking their release through
compassionate release has exacerbated the consequences of substandard medical treatment and
care in BOP. Early in the pandemic, Director Carvajal noted that "prisons are not designed for
social distancing. In fact, they are designed for just the opposite."21 By design, BOP was already
susceptible to the pandemic; but BOP's failure to swiftly implement preventative measures in
response to the pandemic amplified the risk, and ultimately the damage. There was never much
debate about what interventions would be needed: from the earliest days of the pandemic, a chorus
of public health experts emphasized that lowering prison populations would be the most important

15 Hearing on COVID Outbreaks and Management Challenges Before the Subcomm. on Com., Just., Sci., and Related Agencies of the H.
Comm. on Appropriations 117th Cong. (Mar. 24, 2021) (Statement of Inspector General Michael E. Horowitz at 5) ("Horowitz Statement"), https://oig.justice.gov/news/testimony/statement-michael-e-horowitz-inspector-general-usdepartment-justice-us-house-0.
16 Keri Blakinger and Keegan Hamilton, "I Begged Them to Let Me Die": How Federal Prisons Became Coronavirus Death Traps,
The Marshall Project (June 18, 2020), bit.ly/3dJcyrg; Daniel Brown and Nkechi Taifa, Congress Must Do More to Protect People in Prisons and Jails and those Re-entering the Community, Des Moines Register (Sept. 9, 2020), bit.ly/3fK5yxf.
17 Horowitz Statement at 4 6.
18 Pandemic Response Accountability Committee, Federal COVID-19 Testing Report (Jan. 2021),
https://www.pandemicoversight.gov/our-mission/publications-reports/federal-covid-19-testing-report (noting BOP
gave test to 66,587 of the 218,000 individuals in its care).
19 Hearing on Oversight of the Fed.. Bureau of Prisons Before the U.S. Marshals Serv. Subcomm. on Crime, Terrorism, and Homeland Sec.
of the H. Comm. on the Judiciary, 116th Cong. at 43:38 (Testimony of Michael Carvajal) (Dec. 2, 2020),
https://www.cspan.org/video/?506909-1/federal-bureau-prisons-us-marshals-service-oversight-hearing.
20 Horowitz Statement at 7.
21 Hearing on Examining Best Practices for Incarceration and Detention During COVID-19 Before the S. Comm. on the Judiciary 116th
Cong. 5 (June 2, 2020) (Statement of Michael Carvajal at 5),
https://www.bop.gov/resources/news/pdfs/06022020_written_statement.pdf

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
5

tool to stop the spread of COVID-19 in prisons.22 But throughout the pandemic, BOP has sorely underutilized two key authorities to achieve this goal: home confinement and compassionate release. Home Confinement. The CARES Act, enacted on March 27, 2020, gave then-Attorney General (AG) Barr broad authority to dramatically expand the use of home confinement to protect the most vulnerable from COVID-19.23 Instead of making meaningful use of this authority, AG Barr and BOP issued restrictive and confusing guidance and memos, limiting access to home confinement.24 While BOP apparently has released new guidance narrowly expanding the eligibility for CARES Act home confinement,25 that guidance does not appear to adequately expand the criteria for home confinement, and continues to misuse PATTERN a failed risk assessment tool described in greater detail below to make life or death decisions.26 And as Senator Grassley noted, DOJ's position that individuals currently released on home confinement who have successfully abided by conditions of home confinement must return to custody after the pandemic "fails to comply with the spirit" of the FSA.27

BOP has not been transparent about the extent of its use of CARES-Act expanded home confinement authority. Even as part of his written testimony for the Hearing, Director Carvajal repeatedly cited the misleading statistic that 24,000 have been transferred to home confinement," but only 7,000 of those individuals were transferred early under the CARES Act.28 This means that, assuming an otherwise static population, of the 174,000 people in BOP custody at the beginning of April 2020, BOP has transferred only 4% to early home confinement.
29 There is no public safety

22 See e.g., Nat'l Academies of Sciences, Eng., and Med., Decarcerating Correctional Facilities during COVID-19: Advancing Health, Equity, and Safety (2020), https://www.nap.edu/catalog/5945/decarcerating-correctional-facilities-during-covid19-advancing-health-equity-and.
23 See Coronavirus Aid, Relief, and Economic Security Act, H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2) (2020) ("CARES Act").
24 Letter from David Patton and Jon Sands, Co-Chairs, Federal Public & Community Defenders Legislative Committee, to Att'y. Gen. William Barr, (Apr. 1, 2020), https://www.fd.org/sites/default/files/covid19/defender_letter_ag_barr_re_covid-19_4-1-20_0.pdf.
25 DOJ has not formally released the updated eligibility criteria for CARES Act home confinement. See Letter from Kevin Ring, President, FAMM, to Director Michael Carvajal, https://famm.org/wp-content/uploads/Ltr-to-BOP-onHC-guidance-memos.pdf (noting that a reporter had shared a copy of new guidance with BOP's press office, who confirmed its contents, but that afterwards a new memo was circulated).
26 The new guidance, which BOP has not formally released, apparently specifies that BOP can consider incarcerated persons with "low" in addition to "minimum" classifications for home confinement. Hearing at 1:40:40.
27 Hearing at 18:14 19:43.
28 Hearing (Written Statement of Michael Carvajal at 5), https://www.judiciary.senate.gov/imo/media/doc/BOP Director - Written Statement 2021-04-15 SJC Hearing .pdf.
29 Joseph Neff & Keri Blakinger, Few Federal Prisoners Released Under COVID-19 Emergency Policies, The Marshall Project (Apr. 25, 2020), https://bit.ly/2LbOTCj (over 174,000 individuals in BOP custody at the beginning of April 2020); BOP COVID-19 site (As of April 7, 2021, the "total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 23,753"). Currently there are 152,124

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
6
rationale for this: Director Carvajal testified that, since passage of the CARES Act, only 3 people of the nearly 24,000 BOP sent to home confinement have been returned to prison for new criminal conduct.30 Another 148 individuals were returned to BOP custody for technical violations of release conditions.31 OIG investigations have shed further light on BOP's inadequate use of home confinement. At the Butner complex, OIG's independent analysis identified 1,829 individuals in minimum or low security custody who were potentially eligible for home confinement. Yet months later, only 87 had been referred for home confinement, and 3 had died while still in BOP custody pending their transfer home.
32 OIG concluded that "BOP did not fully leverage its expanded
authorities under the CARES Act" to transfer incarcerated individuals in Butner to the safety of home confinement.33 OIG made similar findings at other hard-hit BOP facilities.34
Compassionate Release. The FSA sought to "increase[e] the use and transparency of Compassionate Release," and now individuals no longer must depend on BOP to initiate a motion for compassionate release.35 These amendments reflected Congressional frustration with decades of BOP resistance to compassionate release. 36 Post-FSA, incarcerated individuals may file a motion directly with the court after administrative exhaustion, or 30 days after the warden's receipt of a request, whichever is earlier. While individuals can seek release on their own, BOP still acts as a gatekeeper, and it still has the authority to initiate compassionate release requests that it deems meritorious. But instead of following Congressional intent by using the compassionate release tool to permanently lower prison populations, BOP opted to automatically review all compassionate individuals in BOP custody. Bureau of Prisons, Population Statistics (accessed May 3, 2021), https://www.bop.gov/mobile/about/population_statistics.jsp.
30 Hearing at 55:40 58:32.
31 Id.
32 Dept. of Just. Office of Insp. Gen., Pandemic Response Report 20-031 Remote Inspection of Federal Correctional Complex Butner
24 (Jan. 2021) (OIG Butner Report), https://oig.justice.gov/sites/default/files/reports/21-031.pdf.
33 Id. at 22.
34 Dept. of Just. Office of Insp. Gen., Pandemic Response Report 20-086 Remote Inspection of Federal Correctional Complex Lompoc
ii (July 2020) (OIG Lompoc Report), https://oig.justice.gov/sites/default/files/reports/20-086_0.pdf ("The BOP's use of home confinement . . . was extremely limited. As of May 13, over 900 Lompoc inmates had contracted COVID-19 and we determined that only 8 inmates had been transferred to home confinement in accordance with BOP guidance.");
Dept. of Just. Office of Insp. Gen., Pandemic Response Report 21-003 Remote Inspection of Federal Correctional Complexes Oakdale
and Pollock 24, (Nov. 2020), https://oig.justice.gov/sites/default/files/reports/21-003.pdf ("As a result, we found that in April and early May Oakdale's ability to use home confinement . . . was limited.").
35 First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)).
36 See United States v. Redd, 444 F. Supp. 3d 717, 725 (E.D. Va. 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."); 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications.")

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
7
release requests as requests for home confinement, under its restrictive and confusing guidelines.
37
In the first three months of the pandemic, BOP approved only 11 of the 10,940 0.1% of compassionate release requests it received.38 One of the deadliest complexes in the BOP system with 30 in-custody COVID-19 deaths,39 Federal Correctional Complex Butner, received hundreds of compassionate release requests per month from March to June 2020, yet of the individuals granted compassionate release by courts during that timeframe, only one person had his request approved by BOP prior to being granted release by the court.40
We may never know exactly how many meritorious requests BOP ignored, and BOP has still not provided to Congress its statutorily required annual report detailing compassionate request release denials and grants, which was due in December 2020.41 But at least 55 individuals died in BOP custody after filing for and in some cases, even after being granted (by a judge, not the BOP) compassionate release.42 In New Jersey, Dominick Pugliese, a grandfather of 11 with underlying medical conditions, sought compassionate release based on his susceptibility to the virus, which the government opposed.43 When he became sick, BOP failed to inform his attorney or his family. Mr. Pugliese had been on a ventilator for over a month by the time a judge granted his compassionate release motion; he died shortly after. In Texas, Marie Neba was a stage 4 cancer patient with twin 10-year-old sons and a 19-year-old daughter, who was incarcerated at FMC Carswell in Texas. Months before her death, she wrote to the court: "I don't think I will make it here if I continue under such horrible conditions."44 But the government opposed each of her requests for relief, claiming that she was being well cared for. She died alone, on a ventilator. BOP could have expedited each of these individual's requests for compassionate release, but did not. The pandemic tested BOP's willingness to effectuate the spirit of the FSA reforms to the compassionate release statute, and it fell far short.

37 Examining Best Practices for Incarceration and Detention During COVID-19 Hearing Before the Comm. on the Judiciary 116th
Cong. (June 2, 2020) (Testimony of Michael Carvajal at 1:15), https://www.c-span.org/video/?472615-1/senatejudiciary-hearing-prison-safety-coronavirus-pandemic.
38 Keri Blakinger and Joseph Neff, Thousands of Sick Federal Prisoners Sought Compassionate Release. 98 Percent Were Denied,
The Marshall Project (Oct. 7, 2020), https://bit.ly/3cVjnHI.
39 Joseph Neff and Dan Kane, They Were Freed from an NC Prison   But Couldn't Escape COVID-19, The News & Observer, (July 10, 2020), https://www.newsobserver.com/news/coronavirus/article244131227.html.
40 OIG Butner Report at 24.
41 18 U.S.C. § 3582(c)(3).
42 Hearing (Statement of Anita Aboagye-Agyeman and Alison K. Guernsey) (Apr. 15, 2021), https://law.uiowa.edu/sites/law.uiowa.edu/files/2021-04/Congressional Testimony - 4-13-21-
Final.pdf; Alison Guernsey, List of Compassionate Release Attempts, Compassionate Release Work (Mar. 29, 2021), https://law.uiowa.edu/sites/law.uiowa.edu/files/2021-03/List of Compassionate Release Attempts -
3-29-21.pdf.
43 Joe Atmonavage, 2 Inmates Begged for Release from Federal Prison in N.J. Where Coronavirus Raged. They Both Died of COVID,
NJ Today (Mar. 14, 2021), https://bit.ly/3wAUnwy.
44 Kaley Johnson, Women Fight for Release from Fort Worth Prison. Some with COVID-19 Died while Waiting., Fort Worth StarTelegram (Sept. 3, 2020), https://bit.ly/2Q99ooY.

Case 3:21-cv-00498-KAD   Document 8   Filed 05/19/21   Page 9 of 19

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A
----------------------------------------------------------------------------------------------

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
8
Conditions in BOP are unsafe and inhumane. OIG, which has conducted at least 16 remote inspections of facilities housing individuals in the custody of the Bureau of Prisons,
45 found that
"[m]aintaining a safe, secure, and humane prison system remains a challenge for DOJ and the BOP."46 Critically, BOP's failed pandemic response has been compounded by its longstanding medical and correctional staffing shortages."47 Well before the pandemic, BOP suffered from significant staffing shortages, including shortages of medical staff, despite an ongoing decline in BOP population beginning in 2013.
48 This, in combination with the pandemic, has exacerbated the
lengthy wait times for access to treatment for chronic conditions.49 Even prior to the pandemic, "staff and BOP union officials noted that shortages affected institution safety, inmate access to programming, and the manageability of staff workloads.
50 And during the pandemic, media and firstperson reports indicate that women at certain facilities did not have access to basic hygiene
products, or feminine hygiene products.51 Preexisting deficiencies in healthcare for pregnant prisoners were exacerbated by the pandemic, 52 and the death of 30-year-old Andrea High Bear on
45 U.S. Dept. of Justice Office of the Inspector Gen., Capstone Review of Findings from Remote Inspections of Facilities Housing
Federal Bureau of Prisons Inmates during the COVID-19 Pandemic (last accessed May 3, 2021), https://oig.justice.gov/node/18033.
46 U.S. Dept. of Justice Office of the Inspector Gen., Top Management and Performance Challenges Facing the Department of Justice 2020 at 12 (Oct. 16, 2020), https://oig.justice.gov/sites/default/files/reports/2020.pdf.
47 Id. at 16; Horowitz Statement at 8 ("For example, while the BOP directed Wardens in March 2020 to limit the movement of staff between different areas of an institution to help control the spread of infection, our FCC Lompoc remote inspection report found that FCC Lompoc officials delayed implementation of this directive for 15 days due to the preexisting shortage of correctional staff.").
48 Even prior to the pandemic, "a substantial expenditure of the BOP involves the cost of providing medical care to its inmate population," which often had to be contracted out. Horowitz Statement at 9.
49 Dr. Venters Statement at 4 (Individuals face "long reported delays in their scheduled care for asthma, diabetes, hypertension and other common health problems in BOP facilities.").
50 Gov't Accountability Office, Opportunities Exist to Better Analyze Staffing Data and Improve Employee Wellness Programs (Feb.
2021), https://www.gao.gov/assets/720/712631.pdf. Director Carvajal acknowledged BOP's "overreliance" on the practice known as augmentation, in which in which employees assigned to other jobs must take on correctional officer roles, at the expense of safety, COVID-19 best practices, and key rehabilitation initiatives. Hearing on COVID Outbreaks and Management Challenges Before the Subcomm. on Com., Just., Sci., and Related Agencies of the H. Comm. on Appropriations, 117th
Cong. (Testimony of Michael Carvajal at 01:18:56) (Mar. 18, 2021), https://www.c-span.org/video/?509989-1/covid-19-pandemic-federal-prisons.
51 Assoc. Press, More than 500 Women Test Positive for COVID-19 at Federal Medical Prison in Fort Worth, Dallas Morning News (Jul. 21, 2020), https://www.dallasnews.com/news/2020/07/21/more-than-500-women-test-positive-for-covid19-at-federal-medical-prison-in-fort-worth/ ("several women at Carswell told the newspaper that the facility did not
have enough sanitizing supplies or protective equipment"); Roni Caryn Rabin, Vulnerable Inmates Left in Prison as COVID Rages, N.Y. Times (Feb. 27, 2021), https://www.nytimes.com/2021/02/27/health/coronavirus-prisons-danbury.html (advocates submitted filings to the court "documenting their concerns including a lack of hand soap in the women's bathrooms during the Covid-19 outbreak in December" in the Danbury camp. Later, "women were moved hastily; many said they did not have time to pack important items like medications, asthma inhalers and feminine hygiene products.").
52 Gov't Accountability Office, Pregnant Women in DOJ Custody at 38 (Jan. 2021),

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

https://www.gao.gov/assets/720/711973.pdf (finding that BOP policies did not fully align with half of the national guidance recommendations on pregnancy-related care topics, with a resulting increased "risk that pregnant and postpartum women may not receive treatment and care in accordance with national guidance recommendations"

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
9
April 28, 2020 four weeks after giving birth to her daughter while on a ventilator is emblematic of the tragedy within BOP.53
In addition, BOP's quarantine and medical isolation policies often mirror solitary confinement. 54
Staff at one facility flagged that because of this policy, symptomatic persons failed to seek medical attention, because it would result in being placed in highly restrictive "special housing."55 Confinement within BOP has become more restrictive and frequent lockdowns have limited movement and shuttered programming.56 But, as detailed below, the pandemic alone does not explain BOP's failure to implement the rehabilitative reforms of the FSA.

II. The Failed Promise of the First Step Act

The First Step Act of 2018 (FSA) was intended to shorten certain federal prison sentences and to reorient the federal prison system away from pure punishment and towards rehabilitation. The FSA's ameliorative sentencing provisions have made significant strides: as of September 28, 2020, BOP has released 2,509 individuals who qualified for retroactive Fair Sentencing Act of 2010 relief.57 But since the FSA's enactment, little has been done to advance the Act's core prison reform: a system designed to reduce recidivism risk by offering individuals incentives in exchange for their participation in evidence-based programming and productive activities.58 To create that system, the FSA directed the DOJ to dramatically expand programming in BOP facilities,
59 and to develop a risk
and needs assessment system ("RNAS") that could determine "the recidivism risk of each prisoner" and "the type and amount of evidence-based recidivism reduction programming for each."60 Unfortunately, DOJ and BOP have failed to meet the programming or RNAS mandates and have undercut the promise of the FSA by promulgating restrictive policies behind closed doors. More than two years after the FSA became law:

   The DOJ has failed to release data and information needed for stakeholders to evaluate the accuracy of its risk-assessment tool, "Prisoner Assessment Tool Targeting Estimated Risk

53 Nicholas Bogel-Burroughs & Vanessa Swales, Prisoner with Coronavirus Dies After Giving Birth While on Ventilator, N.Y. Times (Apr. 29, 2020), https://nyti.ms/3duihji.
54 Walter Pavlo, Bureau of Prisons Using Solitary Confinement to Curb Covid-19 Contagion, Forbes (July 16, 2020), https://bit.ly/3fMYyQ5; OIG Lompoc Report at 12; OIG Butner Report at 4.
55 Dept. of Just. Office of Insp. Gen., Pandemic Response Report 21-053 Remote Inspection of Metropolitan Correctional Center
Chicago 5 (Mar. 2021), https://oig.justice.gov/sites/default/files/reports/21-053.pdf.
56 In Lompoc, OIG found that "y, during the lockdown, inmates were confined to their cells for 24 hours a day without recreation, which is more restrictive than conventional Special Housing Unit (SHU) placement." OIG Lompoc Report at 11.
57 See Off. of Att'y Gen. U.S. Dep't of Justice, The Attorney General's First Step Act Section 3634 Annual Report at 7(Dec. 2020),
https://bit.ly/2M3Mr4b ("DOJ Annual Report")
58 18 U.S.C. § 3632(d).
59 18 U.S.C. § 3633.
60 FSA at Title I, § 101(a) (codified at 18 U.S.C. § 3632(a)).

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
10

and Needs" (PATTERN), despite indications that it leads to racial disparities in risk classification.

The National Institute of Justice (NIJ) has reported that consultants hired by DOJ to revalidate PATTERN were unable to do so due to errors and inconsistencies. (Stated differently: there is no validated risk-assessment tool currently in place at BOP.) As a result of the errors and inconsistencies an unknown number of individuals in BOP custody have received incorrect risk designations;
61

BOP does not have a complete needs assessment system in place;
62

BOP has promulgated a restrictive time-credit rule that would effectively gut the FSA's incentive structure and that withholds time credits from individuals who have completed evidence-based programming and productive activities after the FSA's enactment;
63

The FSA's Independent Review Committee (IRC) has concluded that "even a full return to pre-COVID-19 BOP programming levels will not be sufficient to make available evidencebased recidivism reduction programs and productive activities for all eligible" individuals by the FSA's statutory deadline of 2022.64

Unforeseen circumstances, like the 2019 government shutdown and COVID-19 pandemic, have no doubt contributed to some of these failures. But they cannot take all the blame. As Senator Grassley noted at the Hearing, the "pandemic hijacked many of the implementation efforts, but [BOP] must do better and follow the law without excuse."65

Transparency & racial disparities. DOJ's development of PATTERN and BOP FSAimplementation policies has been largely shuttered from public view, despite the vocal concerns of

61 See Nat'l Inst. Justice, 2020 Review and Revalidation of the First Step Act Risk Assessment Tool at 7 (Jan. 2021), https://bit.ly/3cNrm93 ("NIJ Report") ("Due to the identified errors or inconsistencies found, the revalidation of the risk assessment tool will be deferred until corrections to the risk tool are made.").
62 See Off. of the Att'y Gen., U.S. Dep't of Justice, The First Step Act of 2018: Risk and Needs Assessment System 64, n.3 (2019), https://bit.ly/3bOUNaI ("PATTERN does not currently include a needs assessment component."); Off. of the Att'y Gen., U.S. Dep't of Justice, The First Step Act of 2018: Risk and Needs Assessment System  Update 17, 23 (2020), https://bit.ly/2KutYxy ("PATTERN Update") (agreeing current needs tool "could be enhanced," new needs assessment is "forthcoming" and that "PATTERN, in its current form, does not contain a new needs tool"); DOJ Annual Report at 31-32 (confirming BOP is only "begin[ning]" to enhance its "needs assessment process").
63 See 85 Fed. Reg. 75,268-75,273 (Nov. 25, 2020), https://bit.ly/2LJQi6D (proposing to codify BOP procedures regarding time credits authorized by the First Step Act of 2018, Pub. L. No. 115-391, §§ 101-102, 132 Stat. 5194 (Dec. 21, 2018)); see also Letter from David Patton and Jon Sands, Co-Chairs, Federal Public & Community Defenders Legislative Committee to Office of General Counsel, Federal Bureau of Prisons, Re: Comments on Docket No. BOP 1176P, RIN 1120-AB76, 'FSA Time Credits' (Jan 22. 2021),
https://www.fd.org/sites/default/files/news/20210122_federal_defender_comments_to_bop_proposed_rule.pdf.
64 See First Step Act Independent Review Comm., Report of the Independent Review Committee Pursuant to the Requirements of Title I
Section 107(g) of the First Step Act (FSA) of 2018 (P.L.115-391) 4 (Dec. 21, 2020), ("IRC Report"); see also 18 U.S.C. § 3621(h)(6) (By January 2022, the BOP "shall" provide programming to all eligible individuals in BOP.).
65 Hearing at 16:50.Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
11
stakeholders66 and calls for data and information.
67 This secrecy contradicts Congress' clear intent:
the FSA drafters understood that the RNAS would directly affect the time that many spend in
prison, and so built in transparency requirements including a mandate that the risk and needs
assessment system be "developed and released publicly."68 Congress also required that the system be
monitored for bias.69
Despite the FSA's transparency mandate, the DOJ has failed to provide the data needed to fully
assess PATTERN for accuracy and bias.70 The limited data it has released, which was associated
with the first version of PATTERN, showed that the tool was likely to have a racially disparate
impact on Black men, who would be far less likely than white men to have a PATTERN score
falling in the "minimum" category: Only 7% of Black men scored as minimum risk, compared with
30% almost one third of white men.71 In addition, DOJ and BOP have made major revisions
and changes to the initial RNAS system and its implementing policies with either no notice, delayed
notice, or insufficient notice. For example, in January 2020, DOJ announced that it had updated
PATTERN to address concerns raised about the first version.
72 The revised version changed the cut
points for the risk categories but did not disclose that information at the time of the January 2020
release. It was only after ProPublica released an article about a newly-found BOP policy document
that altered the previous standards, making it "harder for an inmate to qualify as minimum risk,"73
66 Nat'l Inst. Justice, Stakeholder Statements Submitted in Response to NIJ's First Step Act Listening Sessions (Jul. 2020),
https://www.ojp.gov/pdffiles1/nij/253115.pdf.
67 See, e.g., Letter from David Patton and Jon Sands, Co-Chairs, Federal Public & Community Defenders Legislative
Committee to David B. Muhlhausen, Re: DOJ First Step Act Listening Session on PATTERN (Sept. 13, 2019),
https://federaldefendersny.org/pdfs/Exh C.pdf ("Federal Defender PATTERN Comment").
68 FSA at Title I, § 101(a) (Dec. 21, 2018) (codified at 18 U.S.C. § 3632(a)).
69 See, e.g., FSA at Title I, § 103 (requiring the Comptroller General to conduct an audit of the use of the risk and needs
assessment system every two years, which must include an analysis of "[t]he rates of recidivism among similarly classified
prisoners to identify any unwarranted disparities, including disparities among similarly classified prisoners of different
demographic groups, in such rates."); FSA at Title I, § 107(g) (requiring the Independent Review Committee to submit
to Congress a report addressing the demographic percentages of inmates ineligible to receive and apply time credits,
including by age, race, and sex); FSA at Title VI, § 610(a)(26) (requiring the Director of the Bureau of Justice Statistics to
annually submit to Congress statistics on "[t]he breakdown of prisoners classified at each risk level by demographic
characteristics, including age, sex, race, and the length of the sentence imposed.").
70 See Federal Defender PATTERN Comment (identifying with specificity the data needed to test for bias and accuracy).
71 See U.S. Dep't of Just., The First Step Act of 2018: Risk and Needs Assessment System 62, tbl. 8 (2019) (reporting 29.7% of
white males in the developmental sample fall in the minimum risk category while only 7% of black males fall in that
same category).
72 See PATTERN Update at 8; see also Hearing at 01:05:52 (Testimony of Dir. Carvajal) ("There were some adjustments
made in January of 2020 there was a perceived or actual bias against people of color so they removed two pieces of
that. . . . That was done to remove that bias or perceived bias, and it also created more transparency and fairness.")
73 Ian MacDougall, Bill Barr Promised to Release Prisoners Threatened by Coronavirus Even as the Feds Secretly Made It Harder for
Them to Get Out, ProPublica (May 26, 2020), https://www.propublica.org/article/bill-barr-promised-to-release-
prisonersthreatened-by-coronavirus-even-as-the-feds-secretly-made-it-harder-for-them-to-get-out ("If you change the cut points,
you've effectively changed the instrument.").

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
12
that DOJ released a report including the new cut points.74 To this date, BOP has not publicly
released its "PATTERN field manual," or PATTERN scoring sheets, although these tools are
already apparently in use.75
BOP lacks an approved or validated risk assessment tool and lacks a complete needs
assessment. DOJ has failed to develop the risk and needs assessment tool envisioned by the FSA.
In January of this year, NIJ quietly announced that PATTERN was so riddled with errors and
inconsistencies that NIJ could not fulfill its statutory duty to review and revalidate the tool.76
Because of those defects, an unknown number of individuals have received improper risk
classifications.77 This revelation is particularly shocking in light of BOP's widely criticized78 decision
to use PATTERN to make life or death decisions about who could transfer to the relative safety of
home confinement during the pandemic.79
Nor has DOJ complied with the FSA mandate to develop a needs assessment,80 despite "Congress'
intent that any [FSA]-compliant tool, would, from its inception, have to address both the risk and the
needs of an inmate in relation to possible recidivism."81 While PATTERN is titled as a tool that
estimates 'risk and needs,' it actually assesses only risk.
82 As the Independent Review Committee
(IRC) recently noted, PATTERN "is not a complete 'risk and needs assessment' tool" and BOP's
needs assessment practices are "still evolving."83 The IRC has emphasized that the "FSA . . .
 74 Dep't of Just., First Step Act Implementation Fiscal Year 2020 90-Day Report (June 2, 2020),
https://www.ojp.gov/pdffiles1/nij/254799.pdf.
75 The DOJ's Annual 2020 FSA Report discusses a "[d]raft policy detailing the instructions for manual coding of the
PATTERN risk assessment" that has been the subject of negotiation with the union. DOJ Annual Report at 12.
76 See NIJ Report at 7 ("Due to the identified errors or inconsistencies found, the revalidation of the risk assessment tool
will be deferred until corrections to the risk tool are made.").
77 NIJ Report at 17 ("Depending upon which of the four tools were analyzed, 10 to 27 percent of inmates were
categorized differently between version 1.2 and provisional version 1.3").
78 Letter of the Leadership Conf. on Civil and Human Rights et. al. to David B. Muhlhausen, Comment Letter to Department
of Justice on PATTERN First Step Act (Sept. 3, 2019), https://civilrights.org/resource/comment-letter-to-department-ofjustice-on-
pattern-first-step-act/; See David Patton and Jon Sands, Co-Chairs, Federal Public & Community Defenders
Legislative Committee, to Hon. William P. Barr at 5-6 (Apr. 1, 2020), https://bit.ly/35NBGZy.
79 NIJ Report at 9 (noting that an "inmate's PATTERN risk score was one of several factors used by BOP to determine
which inmates were suitable for home confinement during the COVID-19 pandemic").
80 See supra n. 62.
81 See Letter from Hons. Jerrold Nadler, Chairman, House Committee on the Judiciary, Karen Bass, Chair,
Subcommittee on Crime, Terrorism, and Homeland Security, Hakeem Jeffries, Chairman, House Democratic Caucus,
Sheila Jackson Lee, Member, Subcommittee on Crime, Terrorism, and Homeland Security & Cedric L. Richmond,
Subcommittee on Crime, Terrorism, and Homeland Security to Hon. William Barr, Attorney General & David. B.
Mulhausen, Director, Nat'l Institute of Justice (Sept. 6, 2019) (on file with author); see also FSA, Title I, at § 101.
82 See IRC Report at 4 (PATTERN "is not a complete 'risk and needs assessment' tool"). Off. of Att'y Gen., U.S. Dep't
of Justice, The Attorney General's First Step Act Section 3634 Annual Report 31-32 (2020), ("Section 3634 Annual
Report").
83 Id. at 4 (emphasis in original).

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
13

contemplates the use of fully refined, closely integrated risk and needs protocols" and urged DOJ and BOP "to begin a serious, deliberate project . . . to design, construct, validate, and implement a truly complete and integrated needs assessment system for federal inmates."84
BOP has promulgated rules that would effectively gut the FSA incentive program. BOP has further undercut the promise of the FSA by proposing and already implementing a restrictive interpretation of the FSA's incentive structure.85 The FSA mandates rewards for individuals who successfully participate in programming and activities, which include increased phone and visitation privileges, transfers to institutions closer to home, and, perhaps most importantly, "time credits."86 Time credits earned "shall be applied toward time in prerelease custody or supervised release."87 Contrary to the text of the FSA and inconsistent with its purpose, BOP's proposed rule chips away at the FSA's rewards program. The proposed rule impermissibly restricts an individual's ability to earn time credits, makes it too easy to lose those credits, and unduly excludes broad categories from the earned time credit system. In short, these provisions kneecap the FSA's incentive structure and make it less likely individuals will participate in programs and activities to reduce recidivism and increase public safety.
For example, under BOP's proposed rule, an eligible individual would need to participate in 240 hours of programs and activities to earn 10 days of credit. In order to get 365 days of credit (the 1-year maximum provided for transfer to supervised release), an individual would need to participate for 8,760 hours. This means that even assuming someone programmed 40 hours a week an impossibility it would take 219 weeks, or over 4 years to earn a full year of credit under BOP's proposed rule. This is longer than the average federal prison sentence of 3.8 years.88
What's worse, accruing a year's worth of earned time credits would take far longer than 4 years. No one can participate in programs or activities for 40 hours a week. BOP offers neither the frequency nor capacity to allow people to participate in programs or activities for 8 hours a day. Most approved programs and activities occur only for 1 to 2 hours a week.89 For those activities that do permit greater participation like UNICOR BOP caps the number of hours that can count

84 Id.
85 See 85 Fed. Reg. 75,268-75,273 (Nov. 25, 2020), https://bit.ly/2LJQi6D (proposing to codify BOP procedures regarding time credits authorized by the First Step Act of 2018, Pub. L. No. 115-391, §§ 101-102, 132 Stat. 5194 (Dec. 21, 2018)). We have submitted a comment on this proposed rule that addresses its deficiencies at length. Letter from David Patton and Jon Sands, Co-Chairs, Federal Public & Community Defenders Legislative Committee to Office of General Counsel, Federal Bureau of Prisons, Re: Comments on Docket No. BOP 1176P, RIN 1120-AB76, 'FSA Time Credits' (Jan 22. 2021),
https://www.fd.org/sites/default/files/news/20210122_federal_defender_comments_to_bop_proposed_rule.pdf.
86 See 18 U.S.C. § 3632(d)(1)-(4).
87 18 U.S.C. § 3632(d)(4)(C).
88 See USSC, 2019 Annual Report and Sourcebook of Federal Sentencing Statistics 64, tbl. 15 (2020), https://bit.ly/2N4NkKp (reporting an average length of imprisonment of 46 months for all types of crimes in Fiscal Year 2019).
89 See Fed. Bureau of Prisons, Evidence-based Recidivism Reduction (EBRR) Programs and Productive Activities (PA), https://bit.ly/3qGO6vH (last accessed Jan. 21, 2021) ("Approved Program List").

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
14
towards time credits.
90 And other productive activities, like institutional work assignments don not
count toward credit at all.
91
Further, BOP provides few lengthy programs: of the 71 programs and activities listed on the approved program list, only 14 or 19.7 percent of the programs are 240 hours or more.92 And only 4 of these 240-plus-hour programs are available at all BOP institutions.93 Indeed, even if a person took every approved program BOP offered (another impossibility), she would accrue only 8,143 hours of program time over 600 hours short of what is necessary to obtain a year's worth of time credits.94
Moreover, the rule violates the FSA by categorically refusing to calculate earned time credits for programs that individuals successfully completed after the FSA was enacted and while serving their sentence.95 The rule provides that time credits may only be earned for programs and activities "successfully complete[d] on or after January 15, 2020."96 But this unduly narrows the law. There is nothing in the FSA that excludes earned time credits from attaching to programs and activities completed between the FSA's enactment and January 15, 2020.97 The FSA prohibits credit for programs completed "prior to the date of enactment of this subchapter," and "during official
90 Id. at 1.
91 See Approved Program List.
92 See id.; see also IRC Report at 6. (Dec. 21, 2020), https://bit.ly/3p0fcxD ("IRC Report"). ("[W]e would urge DOJ, BOP, and others. . . to bear in mind that relatively few of the Bureau's currently designated EBRPs and PAs involve 240 or more hours of content.").
93 See Approved Program List.
94 Moreover, BOP's program offerings may continuously grow and shrink. For example, in the Approved Program List linked in BOP's proposed rule, BOP lists 71 approved evidence-based recidivism reduction programs and productive activities. See 85 Fed. Reg. at 75,270 (citing Approved Program List as "current list" of approved programs). But in another document dated October 2020, BOP lists more programs and activities than what is provided in the Approved Program List. See Fed. Bureau of Prisons, First Step Act Approved Programs Guide (Oct. 2020), https://bit.ly/3nMXITR ("October 2020 List"). Further, the October 2020 List offers more hours for some of the same productive activities. For example, "A Healthier Me" is worth 5 hours in the Approved Program List but is worth 10 hours in the October 2020 List. Compare Approved Program List, at 3, with October 2020 List, at 33. "Money Smart for Older Adults" is worth 28 hours in the Approved Program List but is worth 32 hours in the October 2020 List. Compare Approved Program List, at 4, with October 2020 List, at 38.
It is not clear which list is the current list of BOP's approved programs. However, even if the October 2020 List is the official list, a person would still need to complete over 95 percent of all programs offered on that list to accrue a year's worth of earned time credits.
95 See Goodman v. Ortiz, No. CV 20-7582 (RMB), 2020 WL 5015613 (D.N.J. Aug. 25, 2020) (granting habeas relief and ordering the BOP to immediately apply earned time credits).
96 85 Fed. Reg. at 75,272.
97 Indeed, the FSA puts no time limits on earning credits for productive activities at all. See 18 U.S.C. § 3632(d)(4)(B) ("A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed (i) prior to the date of enactment of this subchapter; or (ii) during official detention prior to the date that the prisoner's sentence commences under Section 3583(a)" (emphasis added)

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
15
detention prior to the date that the prisoner's sentence commenced under section 3585(a)."98 That's it. BOP must swiftly remedy this problem by awarding time credits for programs completed by individuals after FSA's enactment.
Compounding the harm from BOP's proposed rule are troubling indications that, in practice, many BOP institutions are refusing to award individuals any time credits. For example, individuals at Sheridan camp in Oregon were "warned" not to bring up earned time credits, or "face retaliation."99 There, staff posted a memorandum stating that: "At this time, time credits are NOT being calculated."100 BOP has reported that no individuals in BOP were released on earned time credits in 2020.101 Individuals in Oregon and in New Jersey have asked courts to intervene, and to force BOP to grant earned time credits.102
Programming. To meet the twin goals of improved public safety and reduced levels of incarceration, the FSA relies heavily on BOP offering substantially increased programming and productive activities to incarcerated individuals. Federal Defenders have long raised concerns that BOP had failed to provide adequate programming, much less enough to meet the increased demand that would be required to make the FSA a success.103 COVID-19 restrictions had a significant impact on programming: 20 out of 29 Evidence-Based Recidivism Reduction Programs were "highly impacted" by the virus; some shut down entirely. 104
The IRC has now warned that "even a full return to pre-COVID-19 BOP programming levels will not be sufficient to make available evidence-based recidivism reduction programs and productive activities'" for all eligible individuals in BOP custody by 2022.105 The IRC has also flagged troubling demographic disparities in eligible individuals who participate in programs.
Even prior to the pandemic, BOP had a long history of not providing sufficient programs.106 Because the recidivism-reduction efforts of the FSA are meaningless without adequate programming, and in light of the IRC's warning, we are deeply concerned that BOP does not have a plan of action to comply with the FSA requirement that BOP "provide all prisoners with the
98 18 U.S.C. § 3632(d)(4)(B).
99 See Cazares v. Hendrix, No. 3:20-cv-02019 (D. Or.), Dkt. 12 at 19 (Mar. 26, 2021) (compiling examples).
100 Id. at 7.
101 See DOJ Annual Report at 23.
102 See Goodman v. Ortiz, No. CV 20-7582 (RMB), 2020 WL 5015613 (D.N.J. Aug. 25, 2020); Cazares v. Hendrix, No. 3:20-cv-02019 (D. Or.), Dkt. 12.
103 See Hearing on the Fed. Bureau of Prisons and Implementation of the First Step Act Before the Comm. on the Judiciary of the H.
Subcomm. on Crime, Terrorism, and Homeland Sec., 116th Cong. (Statement of David Patton at 5), (Oct. 17, 2019), https://docs.house.gov/meetings/JU/JU08/20191017/110089/HHRG-116-JU08-Wstate-PattonD-20191017.pdf.
104 IRC Report at 1.
105 Id. at 2-3
106 Statement of David Patton at 5.

TRULINCS 07457036 - PELLETIER, KENNETH - Unit: DAN-H-A

---

Federal Public & Community Defenders
Legislative Committee
52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738
16
opportunity to actively participate in evidence-based recidivism reduction programs or productive activities according to their specific criminogenic needs, throughout their entire term of incarceration." BOP's past performance, with inconsistent access and quality across institutions, makes it difficult to have confidence that BOP will meet its statutory obligations in this regard. We hope that Congress will continue to closely oversee BOP's efforts on this front, and to appropriate sufficient funding to support adequate programming.
Sincerely,
/s/
David Patton
Executive Director, Federal Defenders of New York
Co-Chair, Federal Defender Legislative Committee
/s/
Jon Sands
Federal Public Defender for the
District of Arizona
Co-Chair, Federal Defender Legislative Committee
/s/
Lisa Freeland
Federal Public Defender for the
Western District of Pennsylvania
Chair, Defender Services Advisory Group
cc: Hon Merrick Garland, Attorney General
Mr. Michael Carvajal, Director, Federal Bureau of Prisons
Chairman Jerrold Nadler, United States House Committee on the Judiciary
Ranking Member Jim Jordan, United States House Committee on the Judiciar



Micheal m l[c]
76060-066
fci Danbury
Route 37
Danbury Ct 06811

Office of the clerk
United States District Court
U.S. courthouse
915 Lafayette Boulevard
Bridge Port, connecticut

White Plains, NY 10610
MON MAY 17 2021 PM